**SILLS CUMMIS & GROSS P.C.**
S. Jason Teele, Esq.
Gregory A. Kopacz, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000 (Telephone)
(973) 643-6500 (Facsimile)
*Proposed Counsel to the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>INTEGRATED DENTAL SYSTEMS, LLC.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-_____ (___) |

**DECLARATION IN SUPPORT OF CHAPTER 11 PETITION**
**AND FIRST DAY PLEADINGS**

I, Carey Lyons, hereby declare under penalty of perjury as follows:

1. I am the Chief Executive Officer of Integrated Dental Systems, LLC (the "**Debtor**"). I am familiar with the day-to-day operations, affairs, and books and records of the Debtor.

2. On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court.

3. The Debtor is currently operating its business and managing its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no request has been made for the appointment of a trustee or examiner. No official committee of unsecured creditors has been appointed.

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Integrated Dental Systems, LLC (2970). The location of the Debtor's service address is: 145 Cedar Lane, Englewood, NJ 07631.

4. On the date hereof or shortly thereafter, the Debtor intends to file a number of motions and applications (collectively, the "**First Day Motions**") in order to allow the Debtor to operate while under the protection of this Court with minimum disruption or loss of value. I am familiar with the contents of the First Day Motions, and believe the relief sought in each such motion is necessary to ensure that the value of the Debtor's estate is maximized.

5. I submit this declaration (the "**First Day Declaration**") in support of the First Day Motions. Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based on my personal knowledge, information supplied to me by the Debtor and its professionals, were learned from my review of relevant documents or are my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. I am over the age of eighteen (18) and authorized to submit this First Day Declaration on behalf of the Debtor. If called upon to testify, I could and would testify competently to the facts set forth herein.

6. This First Day Declaration is presented in four parts: Part I describes the background and business of the Debtor; Part II describes the Debtor's prepetition capital structure and indebtedness; Part III describes the circumstances leading to the commencement of the chapter 11 case; and Part IV sets forth the relevant facts in support of each of the First Day Motions.

## PART I
## BACKGROUND AND BUSINESS OF THE DEBTOR

7. The Debtor provides dentists with a full suite of tooth replacement systems, supporting products, educational resources, and clinical support.

8. Originally known as Megagen USA, Inc. ("**Megagen**"), the Debtor was founded as an exclusive U.S. distributor for Megagen Implant Company, Ltd. ("**Megagen Korea**"). In 2013, the Debtor's management team, led by Carey Lyons and David Singh, the Debtor's Chief Executive Officer and Chief Financial Officer, respectively, acquired the assets of Megagen and

began operating independently of Megagen Korea while still sourcing a substantial amount of product from Megagen Korea under an exclusive Supply Agreement (defined below).

9. After purchasing the assets of MegaGen and commencing operations, the Debtor built a strong network of sales representatives and customers throughout the United States, which resulted in significantly greater market share. From 2017 to 2019, the Debtor experienced a 14.5% compound annual growth rate in revenue, from $12.8 million to $16.8 million, and improved EBITDA to $0.9 million in 2019, from breakeven in 2017. Sales increased approximately fivefold between 2013 and 2019.

10. During this time, the Debtor was the largest sales organization in the world for Megagen Korea-branded products. However, as discussed in detail below, the Debtor's business and financial condition were substantially damaged by misconduct and wrongful acts committed by Megagen Korea and others.

## PART II
## THE DEBTOR'S PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

**A.     Secured Debt**

      **i.     The ConnectOne Note**

11. Prior to the Petition Date, the Debtor and ConnectOne Bank ("**ConnectOne**") entered into a Second Amended and Restated Promissory Note (Revolving), dated as of November 27, 2019 (as amended, modified or otherwise supplemented the "**Note**"),[2] pursuant to which the Debtor agreed to pay to ConnectOne the sum of $2,000,000, or such lesser amount as may be then advanced and outstanding, together with all accrued but unpaid interest thereon – at a floating rate set at 2.25% above the Prime Rate (as defined in the Note), calculated on the basis of a 360-day year (and subject to a floor of 5.50% per annum) – and any other charges or fees as

---

[2] The Note initially evidenced a temporary ninety (90) day extension of a Commercial Line of Credit Agreement and Note, dated October 29, 2017 (which was previously renewed on November 7, 2018), made by the Debtor in favor of ConnectOne, in an amount of up to $2,000,000 or such lesser principal amount as recorded on the books and records of ConnectOne.

set forth in the Note. Under the Note, the Debtor is required to make monthly payments of accrued and unpaid interest only on the twenty-ninth (29th) day of each and every month.

12. As security for the payment of its obligations under the Note, the Debtor arranged for the execution and delivery to ConnectOne of that certain: (i) Security Agreement (All Business Assets) dated as of November 7, 2018 (the "**Security Agreement**"), pursuant to which the Debtor granted to ConnectOne a first priority security interest in any and all assets and property of the Debtor, including, without limitation, any and all accounts receivable, equipment and inventory, and (ii) Guaranty, dated as of November 27, 2019, made by Carey Lyons and David Singh, in favor of ConnectOne. All collateral given to secure the Note also secures any additional loans, indebtedness or other obligations due to ConnectOne from the Debtor, including, without limitation, that certain Promissory Note, dated November 27, 2019, made by 145 Cedar, LLC in favor of ConnectOne in the principal amount of $1,845,000.

13. As of the Petition Date, the principal balance due under the Note approximates $1,977,604.17.

## ii. The U.S. Small Business Administration Note

14. On or around June 16, 2020, the Debtor executed a Loan Authorization Agreement and a Note (the "**SBA Note**") with the U.S. Small Business Administration (the "**SBA**"). Pursuant to the SBA Note, the Debtor agreed to pay the SBA one hundred and fifty thousand dollars ($150,000), interest on the unpaid principal balance of the SBA Note, and all other amounts owed under the SBA Note. The annual interest rate of the SBA Note is 3.75%. Under the terms of the SBA Note, the Debtor must pay principal and interest payments of seven hundred and thirty one dollars ($731) every month beginning twelve months from June 16, 2020. SBA will apply each installment payment first to pay interest accrued to the day SBA receives the payment and will then apply any remaining balance to reduce principal. All remaining principal and interest is due and payable thirty (30) years from June 16, 2020.

15. As security for the payment of Debtor's obligations under the SBA Note, the Debtor arranged for the execution of that certain U.S. Small Business Administration Security

Agreement, dated as of June 16, 2020 (the "**SBA Security Agreement**"), pursuant to which the Debtor granted to the SBA a second priority security interest in: all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes, (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software, and (k) as-extracted collateral, as such terms may from time to time be defined in the Uniform Commercial Code (collectively, the "**SBA Collateral**"). The security interest the Debtor granted under the SBA Security Agreement includes all accessions, attachments, accessories, parts, supplies and replacements for the SBA Collateral, all products, proceeds and collections thereof and all records and data relating thereto. The SBA Note is guaranteed by Carey Lyons.

16. As of the Petition Date, the principal balance due under the SBA Note approximates one hundred and fifty thousand dollars ($150,000.00).

**B.    Unsecured obligations**

17. On or about April 21, 2020, the Debtor received a loan in the original principal amount of $851,000 from ConnectOne, as lender, under the SBA Paycheck Protection Program (the "**PPP Loan**"). The PPP Loan is not secured by property of the Debtor, or otherwise secured, and was used by the Debtor to satisfy payroll and related obligations in accordance with the requirements established by the SBA governing the Payroll Protection Program. The PPP Loan is subject to forgiveness in or around October 2020. Accordingly, the Debtor believes it will have no obligation to repay the PPP Loan but discloses it here for the Court's information.

18. As of the Petition Date, the Debtor estimates that it has approximately $8,669,626.34 in outstanding obligations to trade vendors and other creditors.

**C.    Equity Interests**

19. The Debtor is a limited liability company organized under the laws of New Jersey. Membership interests in the Debtor are owned by the following individuals and entity:

(i) Carey Lyons (55.23%); (ii) David Singh (24.45%); (iii) Martha Miqueo (7.12%); (iv) Sung Lee (5.50%); (v) Megagen Korea (5.50%); and (vi) Steven Pfefer (2.20%).

# PART III
## CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE DEBTOR'S CHAPTER 11 CASE

20. Shortly after acquiring the assets of Megagen, the Debtor and Megagen Korea entered into a supply and distribution agreement (the "**Supply Agreement**"). The Supply Agreement established an exclusive relationship wherein, *inter alia*, Megagen Korea was prohibited from selling, distributing, marketing, or promoting the following anywhere in the United States or Canada: (i) Megagen Korea-branded products; (ii) third party-branded products; or (iii) any products similar in style to Megagen Korea- or Debtor-branded products. The Supply Agreement also required Megagen Korea to supply and timely deliver product to the Debtor.

21. In August 2019, Megagen Korea purported to terminate the Supply Agreement. In response, the Debtor sent a notice of dispute under the Supply Agreement, which had the effect of staying the termination pending resolution of the parties' disputes. The Debtor and Megagen Korea attempted to negotiate an amicable resolution of their disputes and enter into a revised contractual arrangement. The Debtor negotiated in good faith to settle the disputes while Megagen Korea used the negotiations as cover for a plan to unfairly steal the Debtor's personnel and customers.

22. During this time, Megagen Korea repeatedly engaged in bad faith conduct with respect to the Debtor, including: (i) refusing to replace failed dental implant inventory or provide rebates due for products used for education, demonstrations, training sessions and sale samples; (ii) supplying dental implants whose design had not received approval or clearance from the United States Food and Drug Administration (the "**FDA**"); (iii) modifying the design of certain products, including making the modified products incompatible with parts in the Debtor's inventory, without informing the Debtor; (iv) providing defective dental implants, failing or refusing to report the implant failure to the FDA as required by federal law, and then refusing to

honor its own warranty obligations; and (v) refusing to exchange or provide credits for returned inventory.

23. In addition, beginning in the second half of 2019, Megagen Korea and others began a campaign to raid the Debtor's sales representatives, sales managers, and other key personnel. In order to entice the Debtor's personnel, Megagen Korea and others acting in concert with it intentionally made material misrepresentations concerning, *inter alia*, the Debtor's financial condition, inventory, commercial agreements, honoring of warranties, and more. The Debtor lost several key sales employees as a result of these misrepresentations. Further, at Megagen Korea's direction or with its knowledge and consent, while working as a salesman for the Debtor, Jun Heo, along with other key sales employees, notified the Debtor's customers that they could buy product from Megagen Korea at lower prices if they purchased the product through a sales entity owned, upon information and belief, by Mr. Heo and Megagen Korea.

24. The Debtor lost a significant amount of sales, revenue, business, customer relationships, and goodwill as a result of the wrongdoing of Megagen Korea and others acting at its direction or with its knowledge and consent.

25. The Debtor's damaged financial condition was exacerbated by the multi-month closure of dental offices nationwide caused by the Covid-19 pandemic.

26. Consequently, the Debtor had no choice but to commence this chapter 11 case to redress the misconduct and other wrongful acts of Megagen Korea and others, stabilize the Debtor's business and maximize the value of its assets.

27. The Debtor intends to sell substantially all of its assets to Biotech Dental LLC pursuant to an asset purchase agreement dated as of October 7, 2020, or a bidder that presents the highest and best offer for the Debtor's assets after an auction, in a transaction approved by the Court pursuant to section 363 of the Bankruptcy Code.

## PART IV
## FIRST DAY MOTIONS AND APPLICATIONS

28. The Debtor has filed or will file the First Day Motions, seeking various forms of relief designed to maximize the value of its estate for the benefit of creditors and other stakeholders. I have reviewed each of the First Day Motions and believe that the Debtor has satisfied the applicable standards for the relief requested, and that the Court's grant of the requested relief is in the best interests of the Debtor, its estate, as well as that of its creditors and other parties in interest. Each of the First Day Motions is summarized below.

29. **Cash Collateral Motion**. The Debtor seeks entry of an order authorizing the Debtor to use the cash collateral of ConnectOne to carry on its business operations and finance the costs of the chapter 11 case. As of the Petition Date, the Debtor does not have available sources of working capital and financing without the use of ConnectOne's cash collateral.

30. Without the use of cash collateral, the Debtor will not have sufficient liquidity to continue to fund its operations, pay employee payroll and benefits obligations, pay vendors of necessary goods and services, and satisfy other operational requirements during the chapter 11 case. I believe the continued use of cash collateral as requested in the Cash Collateral Motion is essential to the Debtor's ability to continue its operations without interruption and maximize value of its estate for the benefit of all stakeholders.

31. Accordingly, the Debtor requests the entry of interim and final orders (i) authorizing the use of ConnectOne's cash collateral on the terms set forth in the Cash Collateral Motion and subject to the associated budget; (ii) authorizing the Debtor to pay ConnectOne all accrued interest, legal fees and costs owed under the terms of the Note on a monthly basis beginning on October 29, 2020; and (iii) granting adequate protection to ConnectOne to the extent of any diminution in the value of the collateral as a result of the chapter 11 case in the form of replacement liens and a superpriority administrative expense claim. The Debtor's authorization to use ConnectOne's cash collateral is the product of arms-length negotiations, is fair and reasonable under the circumstances, and is in the best interests of the Debtor, its estate,

and all parties in interest. I am advised that the proposed terms governing the use of ConnectOne's cash collateral is consistent with such agreements typically approved in chapter 11 cases in this District.

32.     **Cash Management Motion**. The Debtor seeks entry of an order authorizing the Debtor to (i) continue and maintain its existing cash management system and bank accounts, and (b) continue using its existing business forms, checks and records.

33.     To facilitate the efficient operation of its business, in the ordinary course of business, the Debtor utilizes a centralized cash management system to collect, transfer and disburse funds generated by its operations (the "**Cash Management System**").  The Cash Management System facilitates the Debtor's cash forecasting and reporting, monitoring of the collection and disbursement of funds, maintenance of current and accurate accounting records for all transactions, and administration of the Debtor's two (2) bank accounts maintained at ConnectOne.

34.     The Cash Management System is similar to those commonly employed by businesses comparable to the Debtor, and provides numerous benefits, including the ability to quickly and easily locate and trace funds, which allows for control over corporate funds, ensures cash availability and reduces administrative expenses by facilitating the movement of funds. Any disruption of the Cash Management System would impair the Debtor's operations.

35.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate in the ordinary course without disruption.  Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Cash Management Motion.

36.     **Taxes and Fees Motion**.  The Debtor seek entry of an order: (i) authorizing, but not directing, the Debtor to pay applicable taxing authorities any taxes and fees that have accrued, but were not yet due and owing or were not paid in full as of the Petition Date, in the ordinary course of its business, and (ii) directing all banks and financial institutions to honor and

pay (to the extent that sufficient funds are available in the Debtor's accounts) all checks and transfers for payment of such pre-petition taxes and fees.

37. In the ordinary course of its business, the Debtor (i) incurs and/or collects taxes, including income, sales, use, excise and other taxes (collectively, the "**Taxes**"); (ii) incurs business license, permit and other fees in connection with obtaining licenses and permits necessary to operate its business, miscellaneous fees, and other similar assessments (collectively, the "**Fees**"); and (iii) remits such Taxes and Fees to various taxing, licensing, and other regulatory authorities (collectively, the "**Taxing Authorities**") as they become due. As of the Petition Date, the Debtor had paid all outstanding and currently due Taxes and Fees.

38. It is my understanding that the Debtor's failure to pay the Taxes and Fees could adversely affect the Debtor's business operations because the Taxing Authorities could suspend the Debtor's operations, file liens or seek to lift the automatic stay.

39. I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should grant the Taxes and Fees Motion.

40. **Wage and Benefits Motion**. The Debtor seeks authorization to (i) pay all pre-petition employee claims for wages, salaries and other accrued compensation; (ii) make all payments for which employee payroll deductions were withheld prepetition; (iii) reimburse all prepetition employee business and other expenses; (iv) make prepetition contributions and pay benefits under certain employee benefit plans; (v) honor worker compensation programs; (vi) pay other miscellaneous employee-related costs including processing costs and fees; and (vii) continue certain health, welfare and benefit programs (collectively, the "**Employee Obligations**").

41. As of the Petition Date, the Debtor believes it is current with respect to its employee wages. However, out of an abundance of caution, the Debtor requests authority to pay

such wages, along with any other prepetition Employee Obligations, in an amount not to exceed the statutory cap of $13,650 per employee.

42. I believe the relief requested in the Wage and Benefits Motion is warranted. In short, any delay in honoring the Employee Obligations could severely disrupt the Debtor's relationships with its employees and irreparably impair employee morale at the very time that employee dedication and cooperation is most critical. The Debtor faces the risk that its operations may be severely impaired if the relief requested in this Motion is not granted. At this critical stage, the Debtor simply cannot risk the substantial disruption of its business operations that would attend any decline in workforce morale attributable to the Debtor's failure to pay the Employee Obligations in the ordinary course of business during the pendency of this chapter 11 case. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should grant the Wage and Benefits Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 7, 2020                /s/ Carey Lyons_____
                                                                      Carey Lyons
                                                                      Chief Executive Officer